IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBIN GIVENS and JOHNNIE
O. GIVENS, Jr., on behalf of
insured MICAH DAVIS

      CASE NO.:

    Plaintiffs,

v.

BLUE CROSS AND BLUE
SHIELD OF FLORIDA, INC.,
a Florida corporation,

    Defendant.
_____

## COMPLAINT

Plaintiffs ROBIN GIVENS and JOHNNIE O. GIVENS, Jr., the legal guardians of insured MICAH DAVIS, hereby sue Defendant BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., a Florida corporation, on behalf of insured MICAH DAVIS and allege and affirmatively state as follows:

### Introduction

1. This action arises under the Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. Sections 1132(1), (e), (f), and (g) as well as 28 U.S.C. Section 1331, as this action involves a federal question and a claim

1

by plaintiff for employee benefits under employee benefit plans regulated and governed under ERISA.

2. All administrative remedies have been exhausted.

## Jurisdiction & Venue

3. **Subject Matter Jurisdiction**. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

4. **Personal Jurisdiction**. This Court has personal jurisdiction over Defendant Blue Cross and Blue Shield of Florida, Inc., a Florida corporation ("BCBS") because ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Defendant is either a resident of the United States or subject to service in the United States, and the Court therefore has personal jurisdiction over them. The Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to a court of general jurisdiction in this District as a result of Defendant being headquartered in, transacting business in, and/or having significant contacts with this District.

5. **Venue**. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because (a) the Plans are administered in this District, (b) some or all of the violations of ERISA took place in this District, and/or (c) Defendant may be found in this District.

6. Venue is proper pursuant to the provisions of 29 U.S.C. Section 1132(e)(2) and 28 U.S.C. § 1391(b) as a substantial part of the events that give rise to plaintiff's claims arose in this District and because one or more of the breaches complained of in this complaint occurred in said District.

## Parties

7. Robin D. Givens and Johnnie O. Givens are the legal guardians of insured Micah Davis pursuant to that certain Order Appointing Plenary Co-Guardians of Person and Property, in *In re: Guardianship of Micah Davis*, Case No. 2021-510-GA, in the Circuit Court, Seventh Judicial Circuit, in and for Putnam County, Florida.

8. Insured Micah Davis was, at all relevant times, a resident of Putnam County in the State of Florida.

9. Blue Cross Blue Shield of Florida ("BCBS" or "Defendant") is an insurance company authorized under the insurance laws of Florida with its principal place of business in Jacksonville, Florida.

10. BCBS issued an insurance policy, a group health plan ("the Plan") to Nextran (Employer Contract Number: 71-60210-00) with effective date of March 1, 2021, a copy of which is attached hereto as Exhibit A.

11. At all relevant times, Micah Davis was an employee of Nextran, and a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan (Member ID NZT682470216732).

12. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

## Facts

13. Shortly before midnight on July 28, 2021, the insured, Micah Davis, was involved in a single car accident near the intersection of Silver Lake Drive and Old Peniel Road in Palatka, Florida. As a result of the accident, Micah Davis was severely injured and remains in a near vegetative state. He was an inpatient UF Shands Hospital in Gainesville, Florida from the date of the accident until May 2022.

14. Over the course of Micah Davis' treatment at UF Shands bills for his treatment were submitted for payment to BCBS. Although, on information and belief, some of the bills were paid, BCBS then started denying all claims, including authorization for future necessary care.

15. BCBS sent denials dated September 8, 2021 (Exhibit B), September 10, 2021 (Exhibit C), and October 1, 2021 (Exhibit D).

16. A timely and thorough appeal was filed on behalf of Micah Davis, in accordance with applicable law and the provisions of the Plan, as to the coverage of past and future health care expenses incurred by Micah Davis. A copy of the appeal is attached hereto as Exhibit E.

17. BCBS failed and/or refused to timely respond to the appeal in violation of the Plan and applicable law.

18. As more particularly set forth below, the denials by BCBS to pay for his medical expenses as a result of this accident are erroneous based on both the facts and the law. Accordingly, it is BCBS's obligation to pay all related charges stemming from this accident.

19. On Monday, July 28, 2021, Micah Davis had used his girlfriend's car to drive to work in Jacksonville. He worked as a diesel mechanic.

20. After work he went to the home of a friend of his, Ryan Smith, at 1204 South 13th Street in Palatka. From there, they went to dinner and to have beer at the Cheyenne Saloon, located at 337 South US 17 East Palatka.

21. Mr. Smith drove both of them from his house to the Cheyenne Saloon and arrived sometime between 7:30 to 8:00 p.m.

22. There is no evidence or indication that Micah Davis had any alcohol to drink before arriving at the Cheyenne Saloon.

23. Micah Davis was having personal problems. Mr. Smith and Micah Davis sat and talked for approximately two and a half hours at the Cheyenne Saloon.

24. In addition to having dinner Mr. Smith reports that Micah had several beers, but had stopped drinking at approximately 10:00 p.m., at least a half hour before leaving the restaurant.

25. After leaving the restaurant between 10:30 to 11:00 p.m., they returned to Ryan Smith's home on 13th Street.

26. After arriving back at Ryan Smith's home, Micah Davis and Mr. Smith sat in the front yard talking for another 45 minutes to an hour and a half. No alcohol was consumed by either one of them during that time.

27. All throughout the evening, Micah Davis' girlfriend, Alex Smith, was "blowing up his phone." There were numerous texts and phone calls to his phone, mostly related to where Micah Davis was located and why he had not returned home to bring his girlfriend her car. It appears that the phone texts and calls indicated that it was necessary for Micah Davis to return home immediately. Apparently, his girlfriend and her parents had expected him to come straight home from work.

28. The phone activity was confirmed by the landowner that heard the collision and found Micah's phone on her property the next morning at the scene of the accident.

29. At the time that he left Ryan Smith's home, Micah Davis did not appear to be impaired.

30. However, he might have stayed at Mr. Smith's home had his girlfriend not demanded that he return home with the car.

31. In any event, Micah Davis began driving the approximately 3.2 miles from Ryan's Smith's home to the location of the accident.

32. The route of travel required several turns, including two complex intersections. The first, at the intersection of Hargrove Street and South 15th Street, required a significant jog to the right to continue on Twiggs Street. Thereafter, at the intersection of Twiggs Street and Moseley Avenue, it required travel through a complex intersection including an additional side street that entered that intersection. Thereafter, Silver Lake Drive is a narrow two-lane paved road with at least one bend in the road prior to the location of the accident.

33. Clearly Micah Davis was in a hurry to get where he was going and was travelling at an excessive rate of speed.

34. Along the course of his travel, Micah Davis overtook and passed another vehicle being driven by Ruthie Camille Watson.

35. Ms. Watson estimated that Micah Davis was traveling at 60 or 70 miles an hour at the time she was passed by him. Navigating this pass, in a

no passing zone on Silver Lake Drive, was no easy feat. The roadway is narrow, dark, and required some reasonable degree of focus and concentration.

36. It had been raining that day. Although the traffic crash report indicates that the road was dry, there was some residual moisture on the road from the rain. It rained that day from approximately, 3:28 pm until 9 pm.

37. While in route, Micah Davis received yet another phone call from Alex Smith and spoke to her. Micah Davis told Alex Smith that he was on the way and hurriedly concluded the conversation by saying "I gotta go." It remains unknown and there are conflicting accounts of whether Micah Davis was heading to the home that he was inhabiting with Alex Smith and her parents located at 470 Stokes Landing Road, Palatka, Florida or Alex Smith's current location at her aunt's house at 107 Whispering Winds Road, Palatka.

38. If Micah was proceeding to his home on Stokes Landing, he would have been required to slow down significantly (the posted speed limit was 35 miles per hour in the area of the curve) and veer to the right at the curve. The posted speed limit was 35 miles per hour in the area of the curve with a suggested speed limit of 25 miles per hour.

39. However, if he was heading to see Alex Smith at 107 Whispering Winds Road, he would have made a left turn at that same intersection of the crash onto East Buffalo Bluff Boulevard.

40. If Micah Davis was traveling to the Stokes Landing home, the curve should have been safely navigated at 25 miles per hour. However, if Micah Davis was going to see his girlfriend on Whispering Winds Road the left turn could have only safely been navigated at approximately 5 miles per hour.

41. The investigating Florida Highway Patrol officer estimated his speed at 60 miles per hour at the time he entered the intersection.

42. There is no doubt based on the crash damage that Micah Davis struck the trees at a very high rate of speed. Undoubtedly, it was this excessive speed, prompted by a desire to get where he was going quickly, that was the proximate cause of this motor vehicle accident.

43. In the traffic crash report, the Florida Highway Patrol gave the following two causes of the accident: (1) operated motor vehicle in careless or negligent manner; and (2) drove too fast for conditions. No alcohol was noted.

44. The curve in question is a dangerous one. There have been numerous accidents there over the years, including those resulting in death. The road is dark and there are no road reflectors to clearly delineate the curve. The high incident of accidents at this particular location, including fatalities, suggest very strongly that the dangerousness of the intersection and curve itself was a contributing factor to this accident.

45. The traffic crash report noted the time of the crash as 11:54 p.m., nearly two hours since Micah Davis had last consumed alcohol. The Florida Highway Patrol trooper described the accident as follows:

> Vehicle one (V01) was traveling westbound on Silver Lake Drive approaching Old Peniel Road. The driver of V01 (D01) failed to negotiate a right curve, cross the center line into the eastbound lanes and continued to exit off of the eastbound side of the roadway. The front end of V01 struck a curve warning road sign which was destroyed. The driver's side of V01 struck a tree which caused V01 to go into a counterclockwise rotation. The passenger side of V01 struck a second tree where V01 came to final rest.

46. The Traffic Crash Report also noted Micah Davis' failure to wear a seatbelt.

## General Allegations

47. Insurance coverage was denied because BCBS claimed that the insurance contract "does not cover the requested service." The members benefit booklet allegedly contains the following exclusion:

> INTOXICATION OR DRUG USE. Any service (other than Substance Use Disorder Services), Medical Supplies, charges or losses resulting from a Member being Legally Intoxicated or under the influence of alcohol, any drug or other substance or taking some action the purpose of which is to create a euphoric state or alter consciousness.

48. BCBS apparently relies solely on the above exclusion to deny healthcare benefits to Micah Davis.

49. BCBS's denial concludes that the injuries "were the results of alcohol intoxication" citing a lab test indicating a blood alcohol concentration level of .216%. The blood alcohol test was not provided with the denial.

50. It is Plaintiffs understanding that the blood alcohol sample was drawn at approximately 2:40 a.m., almost three hours after the crash and almost five hours since Micah Davis had last consumed alcohol.

51. Efforts to obtain a copy of the blood alcohol lab test and other pertinent medical records were unsuccessful due to a lack of cooperation by UF Shands Health Care.

52. However, the purported lab results are highly suspect in that they are completely inconsistent with the known facts surrounding the motor vehicle accident.

53. The unconverted facts suggest that Micah Davis began drinking beer at approximately 8:00 p.m., four hours prior to the accident and nearly seven hours before any blood was drawn by UF Shands to evaluate for a blood alcohol content level.

54. Moreover, Micah Davis did not consume any alcohol after 10:00 or 10:30 p.m., over an hour and a half from the time of the accident and nearly five hours before the blood sample was drawn.

55. For Micah Davis to have a blood alcohol level of .216% or higher at the time of the accident is wholly inconsistent with the facts.

56. Moreover, for him to have this BAC at 2:40 a.m. suggests that he would have had to consume nearly 12 beers before he began to drive and his BAC at the time of driving would have been closer to .25% BAC.

57. His girlfriend would testify that he didn't sound drunk when they last spoke on the phone and that she would have been able to tell if he had been drunk. It would have been virtually impossible for Micah Davis to have navigated his course of travel prior to the accident with such a level of impairment, particularly passing another car at a high rate of speed on a narrow two-lane highway.

58. Even the expert opinion cited in the denial notes that he would have been unable to drive with this level of intoxication.

59. Finally, hospital drawn blood alcohol content levels are unreliable. The normal practice for a hospital blood draw is to use a 70% isopropyl alcohol swab. *See*, Kurt Dubowski et al., *Blood Alcohol Testing in the Clinical Laboratory: Approved Guideline*, NCCLS Document T/DM6-A, Vol. 17, No. 14, at 5 (NCCLS, Sept. 997). The protocol for a hospital blood draw is different than one for law enforcement purposes.

60. In addition, on information and belief, Micah Davis was given insulin prior to the lab being drawn, which can impact BAC readings.

12

61. Ultimately, the consumption of alcohol was not the cause in fact of the accident. Rather, it was Micah Davis' excessive speed, loss of control, the conditions of the road, and failure to wear a seatbelt.

62. Apparently, after he lost control and struck the two trees, the failure to wear a seatbelt caused his head to come into violent contact with the vehicle. This severe brain injury obviously resulted in his current condition.

63. The cause in fact of his injury was head trauma as a result of the failure to wear a seatbelt as a result of the failure to navigate the turn as a result of his excessive speed and loss of control.

64. All of these events can, and do, occur in the absence of alcohol consumption.

65. Moreover, even if alcohol consumption is present, it as merely one of many factors precipitating the chain of events that led to the ultimate injury.

66. Even assuming, arguendo, that the consumption of alcohol was a contributing cause to the accident, it was an indirect, rather than a direct cause.

67. BCBS failed and/or refused to timely respond to the appeal. 29 C.F.R. § 2560.503-1 and applicable law required BCBS to honestly, fairly, and timely determine the appeal and respond appropriately.

68. Plaintiffs exhausted all administrative remedies and is entitled to pursue this complaint.

69. All information set forth in this complaint was provided to Defendant during the appeals process and is part of the administrative record.

## COUNT I
## Wrongful Denial of Benefits under
## ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

70. Plaintiffs reallege the statements contained in paragraphs 1 through 69 above and incorporate the same by reference as if set forth fully herein.

71. This is an action for the wrongful denial of benefits due in the past and the future by BCBS to Micah Davis under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

72. In relevant part, § 1132(a)(1)(B) allows a plan participant such as Plaintiff to bring an action "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

73. Plaintiffs completed all prerequisites required for a § 502(a)(1)(B) claim:

(1) the plaintiff properly made a claim for benefits; (2) the plaintiff exhausted the plan's administrative appeals process; (3) the plaintiff is entitled to a particular benefit under the plan's terms; and (4) the plaintiff was denied that benefit.

74. A "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

    a. When a court considers a denial of benefits de novo under the *Firestone* standard, the examining court interprets the governing plan documents without any deference to interpretation by either party to the dispute. *Firestone*, 489 U.S. at 112-13. The Supreme Court indicated that a court should review the claims of employees under a benefits plan as it would "any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent." *Id*.

    b. Differing interpretation rules have led to varying results by ascribing a different meaning to the terms of a contract under construction. For example, the application of the state insurance law principle of contra proferentem leads a court to construe the ambiguous terms of a contract against the insurer under a de novo standard. *Health Servs. of Ga., Inc. v. Employees Health Ins. Co.*, 240 F.3d 982, 994 n.24 (11th Cir. 2001). The rule of contra proferentem is a device for determining the intended meaning of a contract term

that, in the context of ERISA, provides that ambiguous terms in benefit plans should be construed in favor of beneficiaries.

75. BCBS' decision should be reviewed under a de novo standard.

76. The BCBS insurance policy should be enforced to provide Micah Davis' with all past and future benefits to which he is entitled under the Plan. BCBS improperly denied such benefits in the past and, based on its reasoning, will certainly deny such benefits in the future.

77. Micah Davis' alcohol consumption was not the "direct" cause of the accident, nor did the accident "result from" Micah Davis' alcohol use, meaning Micah Davis is entitled to all benefits under the Plan in the past and in the future.

78. "Direct" injury is defined as injury to biological systems of a person, such as acute alcohol poisoning or liver damage. *Blue Cross & Blue Shield of Fla. v. Steck*, 778 So.2d 374 (Fla. 2d DCA 2001). "Indirect" injuries are defined as accidental injuries caused by the behavior of the person while intoxicated. *Id*.

79. Speeding was the direct cause of insured Micah Davis' accident and injuries. Micah Davis' behavior while intoxicated caused his injuries indirectly.

80. Plaintiffs demand attorneys' fees pursuant to ERISA §502(g)(1), 29 U.S.C. §1132(g)(1).

16

WHEREFORE, Plaintiffs demand judgment against Blue Cross and Blue Shield of Florida for all of the benefits and rights under Micah Davis' insurance policy so that Micah Davis receives the necessary and appropriate health care treatment for his condition, attorneys' fees, equitable relief, and any and all other relief which the Court may deem just and proper.

## COUNT II
## Violation of ERISA
## 29 U.S.C. § 1132(a)(3) and (c)(1)

81. Plaintiffs reallege the statements contained in paragraphs 1 through 69 above and incorporate the same by reference as if set forth fully herein.

82. This is an action for the violation of ERISA law, 29 U.S.C. § 1132(a)(3) and (c)(1) by BCBS for failing and/or refusing to process the insured's appeal and render a decision, per 29 C.F.R. R. § 2560.503-1(i)(2)(iii)(A).

83. A timely appeal was filed on behalf of the insured Micah Davis, attached hereto as Exhibit E.

84. BCBS failed and/or refused to timely process the appeal and render a decision. The determination was received on June 15, 2022.

85. BCBS should thereby be prevented from denying any and all claims benefits due to Micah Davis under the Plan.

17

86. Further, BCBS should be subject to sanctions and attorneys' fees incurred as a result of its violation.

WHEREFORE, Plaintiffs hereby demand judgment against Defendant Blue Cross and Blue Shield of Florida, Inc. for damages, sanctions, full healthcare benefits for and on behalf of Micah Davis, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT III
### Declaratory Judgment

87. Plaintiffs reallege the statements contained in paragraphs 1 through 69 and 72 through 80 above and incorporate the same by reference as if set forth fully herein.

88. This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202.

89. An actual case and controversy exists between the parties regarding the liability of BCBS for healthcare benefits for Micah Davis arising out of the automobile accident of July 28, 2021. Specifically, the dispute arises as to the application of the exclusion set forth in paragraph 47 above.

90. BCBS claims that the exclusion justifies its denial of healthcare benefits for Micah Davis.

91. As a result of Micah Davis' condition he continues to require healthcare benefits under the policy and will continue to require such benefits in the future.

92. For the reasons set forth above, Plaintiffs claim that healthcare benefits are payable for the injuries sustained by Micah Davis in the automobile accident in the past and for the future.

WHEREFORE, Plaintiffs hereby seek for this Court to accept jurisdiction of this declaratory judgment action and enter declaratory judgment that the exclusion is inapplicable and that Micah Davis is entitled to healthcare benefits as provided in the policy for the automobile accident. Plaintiffs further request any and all additional relief that may be necessary or proper to which they are entitled as a result of such determination.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable.

DATED this 5th day of July, 2022.

Respectfully submitted,

                        **LAW OFFICES OF KELLY B. MATHIS**

_____
Kelly B. Mathis, Esquire
Fla. Bar No.: 0768588
3577 Cardinal Point Drive
Jacksonville, FL 32257
(904) 549-5755
Email: kmathis@mathislaw.net
Secondary: callen@mathislaw.net
*Attorneys for Plaintiffs*

20